**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEYONA MASSEY, *on behalf of* K.L., | ) | CASE NO. 5:24-CV-2080 |
|  | ) |  |
| Plaintiff, | ) | MAGISTRATE JUDGE |
|  | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) |  |
|  | ) |  |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
|  | ) |  |
| Defendant. | ) |  |

## I.      INTRODUCTION

Plaintiff Keyona Massey seeks judicial review of the final decision of the Commissioner of Social Security[1] denying the application of her minor child, K.L., for Supplemental Security Income (SSI). Compl., ECF No. 1; *see also* 42 U.S.C. §§ 1383(c) and 405(g). The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 8.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying K.L.'s application for benefits.

## II.     PROCEDURAL HISTORY

On March 21, 2022, an application was filed with the agency on K.L.'s behalf, seeking SSI. (Tr. 190.)[2] The application claimed a disability onset date of February 17, 2022. (Tr. 191.)

---

[1] Martin O'Malley resigned as Commissioner of Social Security in November 2024. A series of acting commissioners led the Agency until May 2025, when Frank Bisignano was confirmed as Commissioner.

[2] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 19"). The Court will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 676").

The application identified two disabling conditions: (1) attention-deficit/hyperactivity disorder (ADHD) and (2) "developmentally delayed." (Tr. 201.)

K.L.'s application was denied at the initial administrative-review level (Tr. 83, 90) and again upon reconsideration (Tr. 92, 98.) K.L.'s representative then requested a hearing with an ALJ. (Tr. 120.)

On August 11, 2023, K.L.'s counsel submitted a letter to the ALJ requesting that a medical expert be ordered to attend the hearing. (Tr. 181.) Counsel explained that "nuances in the file regarding both medical and school records" warranted the ALJ having a medical expert specializing in pediatrics review the agency consultants' findings. (*Id.*) In advance of the hearing, K.L.'s counsel submitted a memorandum to the ALJ. (Tr. 242–43.)

The ALJ held a hearing on October 18, 2023. (Tr. 35–59.) K.L. testified and was represented by counsel at the hearing; Ms. Massey also testified. (*See id.*)

The ALJ issued a decision on March 8, 2024, finding that K.L. was not disabled. (Tr. 7–24.) K.L.'s counsel asked the SSA Appeals Council to review that decision, arguing both that the decision was against the weight of the evidence and that the denial of counsel's request for an expert was an abuse of discretion. (Tr. 25, 187–88, 281–82.)

On October 11, 2024, the Appeals Council denied Ms. Massey's request to review the ALJ's decision. (Tr. 1.)

Ms. Massey filed her complaint seeking judicial review of that decision on November 27, 2024. (Compl., ECF No. 1.) She raises the following two assignments of error:

> **First Assignment of Error:** The ALJ erred by not scheduling a medical expert to attend the hearing and for failing to explain why the request was denied.

        **Second Assignment of Error:** The ALJ erred by making the determination that [K.L.] did not meet, medically equal, or functionally equal the listed impairments.

(Pl.'s Merit Br. at 5, 9, ECF No. 9, PageID# 676, 680.)

## III.    FACTUAL BACKGROUND

### A.    <u>Previous Application</u>

A previous application for SSI was filed on K.L.'s behalf on October 18, 2012, alleging disability as of September 9, 2009. (Tr. 63.) An ALJ found that K.L. was not disabled, in a decision dated July 16, 2014. (Tr. 60–82.)

### B.    <u>Personal, Educational, and Vocational Experience</u>

K.L. was born in 2008 and was 13 years old on the date of the application. (Tr. 84.) A school evaluation report in May 2020 identified that K.L.'s reading, math, and other skills were at or "slightly below" her grade level; she was largely participating adequately in class but "[d]oes not follow multi-step directions" and "needs information repeated." (*See* Tr. 338–42.)

K.L. was evaluated in December 2020 by a school psychologist. (Tr. 332–37.) The psychologist noted that a general intelligence assessment in September 2020 described K.L. as of average intelligence with respect to the verbal comprehension, visual spatial, fluid reasoning, and full-scale intelligence quotient (IQ) categories. (Tr. 333.) She scored very low with respect to the working memory and processing speed categories. (*Id.*) The psychologist explained K.L. "has difficulty maintaining and manipulating information mentally" and "has great difficulty processing information quickly and accurately." (*Id.*) K.L. also took an achievement test in September 2020, appropriately attending to tasks and working diligently, despite the fact that she had not taken her ADHD medication on the day of the test. (Tr. 335.) The results fell in the average to very low range, depending on the subtask. (Tr. 335–36.)

3

K.L. was under an individualized education program (IEP) at Akron Public Schools from September 2021 through September 2022. (Tr. 304–20.) The IEP noted that K.L. "is a very likeable student, who works hard, and follows building and classroom expectations." (Tr. 305.) The IEP noted that K.L. performed below average on some classroom and state-wide assessments, struggling with writing and math calculations. (*Id.*) K.L. had "deficits with her working memory," although she had the ability to "remain engaged in tasks." (*Id.*)

K.L. was in the 79th percentile in reading and the 66th percentile in math as of December 2021. (Tr. 291.) In May 2022, a teacher filled out an SSA questionnaire indicating that K.L. was "on level" in reading and math but "below level" in written language. (Tr. 293–302.) The teacher identified that she had not observed any problems with respect to K.L.'s ability to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, or care for herself. (*Id.*)

In June 2022, a school psychologist completed an SSA request for administrative information, indicating that K.L. had qualified for special education "due to ADHD" from second grade through seventh grade. (Tr. 291.) In September 2023, the Summit County Developmental Disabilities Board found K.L. to be eligible for services. (Tr. 246.)

K.L. was under an individualized education program (IEP) at Akron Public Schools from September 2023 through September 2024. (Tr. 248–66; *see also* Tr. 617 (amending the IEP to include transportation)). K.L. was receiving several below-average or failing grades in her classes. (Tr. 268, 639.) The IEP noted that testing showed that K.L. had an average IQ but had "significant weakness[es]" with respect to her working-memory and processing-speed abilities. (Tr. 249.) Despite these weaknesses, the IEP noted that K.L. had made an "easy transition" into high school, had "good attendance," "does not display any behavior problems," and "is able to get to her classes

on time and participates in class discussions." (*Id.*) The IEP was designed to improve K.L.'s reading comprehension, written expression skills, and ability to solve algebraic equations. (Tr. 250.)

### C.    **Function Report**

Ms. Massey completed a function report with respect to this claim. (Tr. 209–17.) The form is not dated. (Tr. 209.) She indicated that K.L.'s daily activities, physical abilities, and ability to communicate are not limited. (Tr. 212–13.) She marked that there was no limitation in K.L.'s progress in understanding and using what K.L. has learned. (Tr. 213.) She identified that K.L.'s impairments do not affect K.L.'s social activities or behavior with other people. (Tr. 214.)

Ms. Massey indicated that K.L. can take care of personal hygiene, help around the house, get to school on time, take needed medication, and accept criticism or correction. (Tr. 215.) Similarly, K.L. is able to study and do homework. (*Id.*) K.L. is able to keep busy on her own and work on arts and crafts projects. (Tr. 216.) K.L. is able to finish things she starts, complete homework, and complete chores most of the time. (*Id.*)

But Ms. Massey marked that K.L. was not able to cook a meal for herself, use public transportation by herself, keep out of trouble, or obey rules. (Tr. 215.) She also marked that K.L. is not able to complete homework on time. (Tr. 216.)

### D.    **Relevant Hearing Testimony**

####    *1.    Argument Regarding a Medical Expert*

K.L.'s counsel reiterated at the hearing that K.L. was requesting a medical expert to attend the hearing. (Tr. 44.) Counsel explained that such an expert was needed because the state agency medical consultants had not had the opportunity to review "updated information" in the file, including additional counseling records and an updated IEP that reflected continued poor

performance in reading comprehension and solving equations. (Tr. 44–45.) The ALJ denied the request, explaining, "I understand what the new information is." (Tr. 45.)

### 2.    K.L.'s Testimony

K.L. testified that she was not getting good grades in high school because "[i]t's hard." (Tr. 39.) She feels that she is working as hard as she can, but she has trouble staying focused on schoolwork, whether at school or at home. (*Id.*) Her medication "[k]ind of" helps, but it wears off toward the end of the school day. (Tr. 39–40.)

K.L. is expected to do chores like laundry, dishes, and keeping her room clean. (Tr. 41.) But K.L. needs reminders to do them. (Tr. 40.) K.L. reads online comic books on her phone. (Tr. 41.)

### 3.    Ms. Massey's Testimony

Ms. Massey testified that K.L. was struggling with school because K.L. was "not doing her work." (Tr. 46.) Ms. Massey identified that K.L. was struggling to focus and pay attention. (Tr. 47.) Ms. Massey has to "babysit" K.L. to ensure that K.L. does her work, or K.L. will get off task. (Tr. 50.)

Ms. Massey testified that she does not notice any real difference when K.L. is on her medication versus when she is not. (Tr. 48.) Ms. Massey has told K.L.'s doctor that she does not think the medication is helping. (Tr. 49.) Ms. Massey complained that K.L.'s doctor ignores Ms. Massey's concerns. (*Id.*)

Ms. Massey further testified that K.L. needs "constant reminder[s]" to do things around the house; K.L. cannot follow multiple instructions, so Ms. Massey needs to give K.L. one instruction at a time. (Tr. 50.) Ms. Massey feels that K.L.'s behavior is not typical, even for a teenager, and

gave an example that K.L. fails to throw away personal hygiene products. (*Id.*) K.L. needs reminders to take showers. (Tr. 57.) K.L. steals food, but nothing else. (Tr. 51.)

K.L. is not "mouthy" and has not gotten in trouble in school. (*Id.*) K.L. is not social, though, and has expressed no interest in making friends. (*Id.*) K.L. generally gets along normally with her brother and with adults. (Tr. 52.) K.L. is physically healthy. (*Id.*) K.L. had trouble navigating a city bus to school and got lost coming home. (Tr. 55–56.) K.L. also has broken two computer tablets at home, one out of anger when a game was not functioning properly. (Tr. 56–57.)

### E.    <u>State Agency Medical Consultants</u>

A disability examiner (Brandy Boggs), a pediatrician (Dana Schultz, M.D.), and a psychologist (Karla Delcour, Ph.D.) reviewed K.L.'s claim at the initial administrative level. (Tr. 83–91.) The doctors evaluated that K.L. has less than marked limitations with regard to K.L.'s ability to acquire and use information and K.L.'s ability to attend and complete tasks, and no limitation with respect to the other domain areas. (Tr. 87–88.) The doctors found the reported symptoms about K.L.'s trouble with memory, sustained concentration, adaptation, and social interaction to be only partially consistent with the record evidence. (Tr. 89.) They noted that the records support that K.L. was in special education classes, avoided eye contact, and was withdrawn. (*Id.*) But they also noted that K.L.'s mother described that K.L. was doing well in school, was able to follow step-by-step instructions, and was able to lie and be sneaky and manipulative. (*Id.*) The consultants further found the December 18, 2019 opinion from Consulting Psychology Inc. to be "completely persuasive" and Dr. Magleby's October 5, 2022 opinion to be persuasive. (Tr. 89–90.)

Therefore, the consultants concluded that K.L. was not disabled. (Tr. 83, 90.) In a letter explaining this decision, the SSA wrote that the evidence shows that K.L. has been affected by

ADHD and developmental delays but "there has been a positive response to treatment," such that K.L. is able to move about, is making academic progress, and performs age-appropriate activities. (Tr. 109.)

In seeking reconsideration of that decision, K.L.'s representative identified that K.L.'s condition had changed, in that her education was "doing worse," her behavior was worse, and her self-care and hygiene was "lack[ing]." (Tr. 222.) The representative indicated that K.L.'s grades had dropped and that K.L. "needs more reminders." (Tr. 224.)

At the reconsideration level, a disability examiner (Dustin Robinson Smith), a pediatrician (Louis Goorey, M.D.), and a psychologist (Jennifer Swain) affirmed the finding that K.L. is not disabled. (Tr. 92–99.) The doctors found the conclusions about K.L.'s limitations from the initial level to be "supported and consistent with medical evidence on file." (Tr. 95.)

In a letter explaining this decision, the SSA wrote that K.L. "is able to understand and carry out simple tasks, maintain relationships with her peers, and care for her basic needs at age appropriate levels." (Tr. 119.)

In appealing this decision, K.L.'s representative wrote that K.L.'s condition had changed again, in that K.L. displayed "[i]ssues with judgment" and had recently run away, being located "outside in the cold." (Tr. 230.) The representative further wrote that K.L. needs reminders and redirection every day and had displayed "[m]ore issues with mood instability and hyperactivity." (Tr. 232.)

F.   **Relevant Medical Evidence**

K.L. underwent a psychological evaluation with clinical neuropsychologist Joshua Magleby, Ph.D., on December 18, 2019, for the purpose of her disability application. (Tr. 283–89.) Dr. Magleby noted that Ms. Massey reported behavior problems—hyperactivity and

impulsivity—since K.L. was around four years old. (Tr. 284.) He noted that treatment records reflected "an active ADHD diagnosis" that was "well controlled." (*Id.*) He noted testing from 2013 that reflected "extremely low overall cognitive development." (*Id.*)

On examination, K.L. was "alert and clearly well oriented." (Tr. 285.) Her behavior was generally cooperative and age-appropriate, although she sometimes interrupted or rushed through instructions. (*Id.*) Her ability to maintain attention and concentration was "adequate for age level expectations," with intelligence appearing to be average or low average. (Tr. 286.) Intelligence testing was largely normal and unremarkable. (Tr. 286–87.)

Dr. Magleby concluded that K.L.'s cognitive development has improved over time, such that she is similar to same-age peers in many areas, although there is some impairment in her processing speed. (Tr. 287.) While she demonstrated several "ADHD signs" during the exam, K.L. was not "overtly distracted or inattentive." (*Id.*) Dr. Magleby identified that K.L.'s ability to acquire and use information, her language skills, and her ability to understand simple oral instructions were all fairly intact. (Tr. 287–88.) K.L.'s ability to "attend to tasks" was also fairly intact, as K.L. was able to pay attention and complete tasks without being overtly impaired by attention problems. (Tr. 288.) K.L.'s ability to interact and relate to others was "more than adequate." (*Id.*) Dr. Magleby wrote that K.L.'s ability in the area of self-care "has been perhaps mildly delayed," based on the report of Ms. Massey. (*Id.*)

At an appointment with Dr. Steingass on May 1, 2021, Ms. Massey reported a "definite difference" in K.L.'s ADHD symptoms with medication. (Tr. 354.) The medication lasted long enough for K.L. to "get through school work." (*Id.*) Dr. Steingass continued K.L. on her medication, noting that K.L.'s ADHD was "well controlled." (Tr. 357.)

At a follow-up appointment with Dr. Steingass on August 12, 2021, Ms. Massey and K.L. continued to report that the medication was "helpful." (Tr. 371.) Dr. Steingass increased the dosage to prevent the medicine from wearing off during the junior high school day. (Tr. 373–74.)

K.L. consulted with Dr. Angela Jones for an annual physical examination on September 25, 2021. (Tr. 385.) Ms. Massey reported that K.L. was "doing well" in school. (*Id.*) K.L.'s mood and affect were normal, and there were no abnormal findings on the exam. (Tr. 388.)

K.L. consulted with Dr. Taylor Hartlaub on April 18, 2022. (Tr. 403.) Ms. Massey continued to report that the ADHD medication was working, but Ms. Massey was concerned that K.L. was stealing candy from Ms. Massey's room and purse and had failed to turn in assignments, leading to decreasing grades. (Tr. 404, 406.) Dr. Steingass reviewed Dr. Hartlaub's progress note and indicated that Ms. Massey's concern was not likely due to inadequately controlled ADHD. (Tr. 402–03.) K.L. was referred to counseling. (Tr. 403.)

K.L. underwent a diagnostic evaluation for counseling related to the stealing and dishonest behavior on June 21, 2022. (Tr. 420, 466–67.) The evaluator noted that K.L. would benefit from school-based therapy and community psychiatric supportive treatment/therapeutic behavioral services to address an impulse-control and conduct disorder. (Tr. 421.)

A counseling treatment plan was developed in July 2022 and re-evaluated in July 2023. (Tr. 456–62, 468–69.) There were several treatment notes between fall of 2022 and summer of 2023 noting missed appointments. (*See* Tr. 464.)

At a school counseling appointment on September 8, 2022, K.L.'s teacher reported that K.L. is "very sweet" and "one of her favorite students." (Tr. 471.) K.L. described falling behind in her schoolwork because she had not yet been issued a computer on which to complete her assignments; she fell behind when she needed to complete the assignments on paper. (*Id.*)

10

Ms. Massey spoke with K.L.'s school counselor over the phone on September 19, 2022. (Tr. 473.) Ms. Massey reiterated that her primary behavioral concern was K.L. stealing candy from her at home. (*Id.*)

K.L.'s school counselor observed K.L. for a few minutes in class on September 21, 2022. (Tr. 475.) K.L. was adequately engaged in class and displayed appropriate social skills with her peers. (*Id.*) In individual counseling, K.L. admitted to stealing candy and acknowledged the wrongness of that action. (*Id.*)

K.L. met with therapist Heather Fowler-Pruchnicki on September 28, 2022. (Tr. 477.) K.L. was at first soft-spoken and minimally engaged, but she was more engaged by the end of the session. (*Id.*) She had trouble distinguishing "wants" from "needs." (*Id.*)

K.L.'s school counselor noted on September 29, 2022, that K.L. reported having a lot of missing homework. (Tr. 479.)

K.L. underwent a second psychological evaluation with Dr. Magleby on October 12, 2022, for the purpose of her disability application. (Tr. 424–29.) Ms. Massey described that K.L. would break household items, including computer tablets, and was not interested in having friends. (Tr. 426.) On examination, K.L. did not demonstrate obvious ADHD signs, but Dr. Magleby noted that K.L. had taken her medication. (Tr. 428.) Dr. Magleby summarized that his observations were "only notable for adequate engagement with this examiner, suggestive perhaps of shyness/anxiety." (*Id.*) Dr. Magleby also concluded that, while K.L. continues to receive IEP services, "it is unclear if at this time she continues to demonstrate actual learning disorders in these areas," and he suggested formal assessments of her cognitive and academic functioning. (*Id.*) K.L.'s ability to acquire and use information was "more than adequate." (*Id.*) Her ability to attend to tasks was "fairly intact." (*Id.*) Her ability to interact and relate to others was adequate. (*Id.*)

11

K.L.'s abilities in the areas of self-care have been mildly delayed. (Tr. 429.) K.L. reportedly engaged in behaviors, like temper outbursts, that were "somewhat elevated and problematic for age expectations but only at home, and without aggressiveness toward others." (*Id.*)

K.L.'s counselor observed K.L. taking a test for a couple minutes on October 19, 2022; K.L. was focused at a "good level." (Tr. 481.) K.L. reported that things were going well at home but became impatient when doing a focus activity. (*Id.*) Ms. Massey reported that K.L. was getting some failing grades. (*Id.*)

K.L. underwent a physical examination with Dr. Lauren Lange Smith on October 31, 2022. (Tr. 434.) Ms. Massey reported that K.L. was "struggling" in school. (Tr. 435.)

At an appointment with the school counselor on November 3, 2022, K.L. reported no concerns at school or at home and was focused "at [a] good level." (Tr. 483.)

K.L. met with therapist Ms. Fowler-Pruchnicki on November 4, 2022. (Tr. 485.) They focused on a time-management activity to help K.L. improve her grades. (*Id.*)

K.L. was again well-focused during an appointment with her school counselor on November 10, 2022, reporting that things were going well at school and at home. (Tr. 487.) K.L. reported on November 16, 2022, that she was using a new binder to stay more organized and said things were going well. (Tr. 489.) K.L. was excited about a class assignment when she met with Ms. Fowler-Pruchnicki the same day. (Tr. 491.)

K.L. remained happy and actively engaged at an appointment with her school counselor on November 29, 2022; K.L. had been helping to cook at home and went shopping with her siblings. (Tr. 495.) On December 8, 2022, the counselor discussed with K.L. an issue of missing schoolwork. (Tr. 497.) A teacher had reported that K.L. is "smart and understands math" but does not complete schoolwork. (*Id.*) On December 16, 2022, the counselor recommended to Ms.

12

Massey that they discuss with K.L.'s doctor whether K.L.'s medication should be adjusted. (Tr. 499.)

K.L. had an appointment with Dr. Steingass on January 12, 2023. (Tr. 569.) Dr. Steingass noted Ms. Massey's concerns, including K.L. struggling with schoolwork and failing to keep her room clean. (Tr. 572–73.) Dr. Steingass noted that K.L. was not suspected to have an underlying neurologic or medical condition, but she wrote that "[e]xecutive dysfunction seems to be a factor" considering K.L.'s disorganization at home. (Tr. 573.) Dr. Steingass continued K.L. on her medication and said that Ms. Massey could try using a booster dose after the school day if inattention was interfering with K.L. getting her work done. (*Id.*)

On January 26, 2023, after the winter break, K.L. reported that she was doing well keeping up with her schoolwork. (Tr. 503.) By February 1, 2023, K.L. was struggling with one class because it required a significant amount of writing. (Tr. 505.) K.L. expressed an interest in joining a school club. (*Id.*) On February 9, 2023, K.L. said she was doing better keeping up with her work, although she still had some outstanding assignments. (Tr. 507.) Things remained largely the same through May 2023, with K.L. doing better with math but "slacking off some" and struggling to complete her history assignments, resulting in a failing grade. (Tr. 509, 511, 513, 515, 517.)

Ms. Massey reported to the counselor in July 2023 that K.L. was doing immature things at home and needed reminders to do things like clean her room and replace the cap on her toothpaste. (Tr. 519.)

At an appointment with a new counselor on July 26, 2023, K.L. reported that she struggled to complete her work assignments because they were "too easy." (Tr. 521.) K.L. had some apprehension about entering high school, as she expressed at several appointments in summer 2023; K.L. felt that school was "boring." (Tr. 523, 525, 527.)

13

K.L. consulted with Dr. Steingass on August 21, 2023. (Tr. 588.) Ms. Massey continued to report that K.L.'s medication helped her focus on her schoolwork and be "less hyperactive"; the visit was concerned primarily on the effect of the medication on K.L.'s appetite. (*Id.*) Dr. Steingass suspected that K.L. may have less impulse control with respect to eating after her medication wears off. (Tr. 593.) Dr. Steingass noted that K.L.'s ADHD had been "very stable" over the years on her medication. (*Id.*)

K.L. met with a new therapist, Jewel Isaac, on August 31, 2023. (Tr. 533.) K.L. was reserved but expressed a goal of making sure she gets her schoolwork done in the upcoming school year. (*Id.*)

## IV.    DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that K.L. was an adolescent on the date the application was filed and was currently an adolescent. (Tr. 11.) The ALJ next determined that K.L. had not engaged in substantial gainful activity since the application date. (*Id.*)

The ALJ identified that K.L. has the following severe impairments: (1) attention-deficit/hyperactivity disorder (ADHD); (2) disruptive, impulse control, and conduct disorder; (3) neurodevelopmental disorder; and (4) mixed receptive-expressive language disorder. (Tr. 11–12.)

However, the ALJ concluded that K.L. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.) The ALJ concluded that K.L. does not have an impairment or combination of impairments that functionally equals the severity of those listings, either. (Tr. 12–13.) Accordingly, the ALJ determined that K.L. was not disabled. (Tr. 19.)

14

## V.  LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3)) or a decision to deny disability insurance benefits (reviewing under 42 U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983).

In addition to considering whether the Commission's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA failed to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.    <u>Standard for Child Disability</u>

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an

impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings to at least equal in severity and duration those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for themselves; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)–(vi).

### C.    Child Functional Equivalency Framework

"A child who applies for supplemental security income is 'disabled' if the child is not engaged in substantial gainful activity and has a medically determinable physical or mental impairment or combination of impairments that results in 'marked and severe functional limitations.'" SSR 09-03p, 2009 WL 396025, at *1 (Feb. 17, 2009) (quoting 20 C.F.R. § 416.906). The Commissioner will assess how a child-claimant can "function in [their] activities in terms of six domains," which "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). "[The child-claimant's] impairment(s) is of listing-level severity if [they] have 'marked' limitations in [at least] two of the [six] domains in paragraph (b)(1)

…, or [at least one] 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d). The Commissioner "will consider [the child-claimant's] functional limitations resulting from all of [their] impairments, including the [impairments'] interactive and cumulative effects." 20 C.F.R. § 416.926a(e)(1)(i). The Commissioner "will consider all the relevant information in [the child claimant's] case record that helps [the Commissioner] determine [the child-claimant's] functioning, including [their] signs, symptoms, and laboratory findings, the descriptions [the Commissioner] ha[s] about [the child-claimant's] functioning from [their] parents, teachers, and other people who know [the child-claimant], and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929." 20 C.F.R. § 416.926a(e)(1)(i). The child-claimant must prove that they are disabled. 20 C.F.R. § 416.912(a).

A marked limitation "interferes seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child claimant's "day-to-day functioning may be seriously limited when [their] impairment(s) limits only one activity or when the interactive and cumulative effects of [their] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

An extreme limitation "interferes very seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). This may be so even though their "impairment(s) limits only one activity or when the interactive and cumulative effects of [the child-claimant's] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(3)(i). "'Extreme' limitation also means a limitation that is 'more than marked.'" 20

18

C.F.R. § 416.926a(e)(3)(i). An extreme-limitation rating is the most severe, and it is reserved for "the worst limitations." 20 C.F.R. § 416.926a(e)(3)(i). But it "does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).

###    D.    <u>Analysis</u>

Ms. Massey contends that the ALJ erred by: (1) declining to schedule a medical expert to attend K.L.'s hearing and failing to explain why that request was denied; and (2) determining, without that medical expert's opinion, that K.L. did not meet, medically equal, or functionally equal the relevant listings.

The Court will consider these assignments of error together, as they are intertwined. Through them, Ms. Massey argues that the ALJ improperly rendered conclusions at Step Three of the sequential analysis based on outdated medical opinions, without obtaining a medical review of the entire record, where records submitted after the state agency administrative review could not be readily interpreted by a layperson.

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917). The Court therefore reviews the ALJ's decision not to obtain an additional medical expert for abuse of discretion. *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) (citing *Halter*, 279 F.3d at 356).

Ms. Massey argues that the ALJ abused his discretion here because: (1) portions of the record came in after the state agency medical consultants had completed their review, which records showed a "downward spiral" in K.L.'s behavior; (2) the ALJ found the opinions from the

consulting examiner and agency consultants to be unpersuasive; (3) the underlying medical issues were complex; and (4) the ALJ failed to explain why he declined to obtain a medical expert to review the new evidence in the file. (Pl.'s Merit Br. at 5, ECF No. 9, PageID# 676.)

After careful consideration, the Court finds that the ALJ did not abuse his discretion in denying the request to obtain an additional expert opinion, and further finds that the ALJ appropriately rendered conclusions at Step Three of the sequential analysis.

It is true that portions of the record were introduced after the state agency medical consultants completed their reviews. Ms. Massey directs the Court to several records that came in after the administrative review: the November 2023 IEP (Tr. 615–46) and a significant number of counseling records (Tr. 452–538).

In arguing that these records required additional expert review, Ms. Massey relies heavily on the SSA's Hearings, Appeals, and Litigation Law Manual (HALLEX) and on a case from this court—*Deskin v. Commissioner of Social Security*, 605 F. Supp. 2d 908, 911 (N.D. Ohio 2008).

First, Ms. Massey directs the Court to HALLEX I-2-5-34 (renumbered to HA 01250.034 in the agency's Programs Operations Manual System), a policy guidance document that requires ALJs to obtain a medical expert opinion in three circumstances and sets forth eleven circumstances in which the ALJ may, in their discretion, obtain such an opinion. Ms. Massey does not claim that any of the mandatory circumstances apply here, but she argues that five of the discretionary circumstances were present:

- where the ALJ "[d]etermines whether a claimant's impairment(s) meets a listed impairment(s);"

- where the ALJ "[d]etermines the degree of severity of a claimant's physical or mental impairment;"

- where the ALJ "[b]elieves [a medical expert] may be able to suggest additional relevant evidence because there is reasonable doubt about the adequacy of the medical record;"

- where the ALJ "[b]elieves [a medical expert] may be able to assist the ALJ by explaining and assessing the significance of clinical or laboratory findings in the record that are not clear;" and

- where the ALJ "[i]s determining the claimant's residual functional capacity, e.g., the ALJ may ask the [medical expert] to offer an opinion about the claimant's functional limitations and abilities as established by the medical evidence of record."

SSA Programs Operations Manual System (POMS), HA 01250.034.

The Commissioner responds that the HALLEX is not binding on the Commissioner or on the Court and provides no basis to find an abuse of discretion, especially where none of the three mandatory circumstances apply. The Court agrees with the Commissioner.

Although HALLEX describes policies that ALJs should follow when conducting hearings and reviewing a claimant's case, HALLEX's procedural guidance is not binding on this court. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *Workman v. Comm'r of Soc. Sec.*, No. 3:20-CV-01821, 2021 WL 8342810, at *12 (N.D. Ohio Nov. 15, 2021); *Robberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019) ("Importantly, HALLEX is an internal guidance tool that does not have the force of law. . . . Indeed, HALLEX does not impose judicially enforceable duties on either the ALJ or this Court.") (internal quotation marks omitted).

Even if the HALLEX were binding, Ms. Massey cannot show that the ALJ violated it because she tacitly admits that none of the three mandatory circumstances applied here. Moreover, other agency guidance provides for further development of the record where the record is incomplete or where there are inconsistencies. *See* 20 C.F.R. § 416.920b(b). As discussed further below, that is not the case here.

21

Ms. Massey next directs the Court to *Deskin v. Commissioner of Social Security*, 605 F. Supp. 2d 908, 911 (N.D. Ohio 2008), arguing that the ALJ improperly interpreted raw medical data contained in therapy and school records in functional terms because there was no medical opinion in the record addressing the full scope of the file.

In *Deskin*, this court announced a rule that "where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Deskin*, 605 F.Supp.2d at 911.

Significantly, however, "*Deskin* has not been universally embraced by courts in this district." *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-cv-1880, 2022 WL 3043060, at *8 (N.D. Ohio Aug. 2, 2022). Indeed, one court in this district has stated that *Deskin* "is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20 CV 1655, 2022 WL 189855, at *2 (N.D. Ohio Jan. 21, 2022) ("*Deskin* has since been critiqued by other courts in this District."). Moreover, the Sixth Circuit has held that requiring an ALJ to base the RFC determination on a physician's opinion "'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)).

In *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the court clarified that *Deskin* is "a narrow rule that does not constitute a bright-line test." *Id.* at *2. *Kizys* held that *Deskin* "potentially applies" only where the ALJ "makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Id.*

Following *Kizys*, courts in this district have recognized that "[w]here an ALJ has opinions that account for the majority of the medical evidence, an ALJ may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt residual functional capacity accordingly." *Phelps v. Comm'r of Soc. Sec.*, No. 1:21-CV-02295-BYP, 2022 WL 18395824, at *9 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted*, 2023 WL 316016 (N.D. Ohio Jan. 18, 2023). Moreover, "an ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (*quoting Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

The Commissioner argues that the ALJ's decision here does not implicate *Deskin*. The Court agrees. Ms. Massey has not convinced the Court that the existing medical sources did not contain sufficient evidence for the ALJ to make a determination or that the record was so complicated that the ALJ required a medical expert to make sense of the evidence.

There will always be some time lapse between the agency's consultants' reports and the ALJ hearing and decision. *See Lunsford v. Comm'r of Soc. Sec.*, No. 3:20cv2665, 2022 WL 2235529, at *2 (N.D. Ohio June 22, 2022); *see also Adams v. Colvin*, No. 1:14CV2097, 2015 WL 4661512, at *16 (N.D. Ohio Aug. 5, 2015) (holding that ALJ did not err in formulating RFC even though approximately ten months had lapsed between medical opinion and ALJ's decision where plaintiff did not demonstrate that subsequent records changed medical evidence to the extent that the medical opinion was outdated).

When records are introduced into evidence between the consultants' review and the ALJ's decision, it is not the volume of records that matters, but their content. Where a plaintiff argues that an RFC violates *Deskin* because of evidence post-dating the relevant medical opinions, "the key question is whether the post-opinion evidence was of the type that would *necessitate* a consultative opinion." *Reidenbach*, 2022 WL 3043060 at *8 (emphasis in original); *see also Phillips v. Comm'r of Soc. Sec.*, No. 4:18 CV 00747, 2019 WL 2017765, at *1 (N.D. Ohio May 7, 2019) (framing the question as whether "there are medical findings in the post-November 2014 records that show a worsening of [the plaintiff's] impairment that require evaluation by an acceptable medical source").

Here, the IEP that post-dated the agency administrative review contains ratings from a Comprehensive Executive Function Inventory (CEFI) completed in October and November 2023; the inventory placed K.L. below the tenth percentile on a number of scales, including "emotional regulation," "organization," "self-monitoring," and others. (*See* Tr. 634–36.) The IEP comprehensively explains what these results mean, provides additional context from K.L.'s teachers, and ultimately concludes that K.L. "presents with deficits in her attention, flexibility,

inhibitory control, initiation, organization, planning, self-monitoring and working memory." (Tr. 636.)

The counseling records—from Red Oak Behavioral Health—set forth treating professionals' observations, reported concerns, and treatment history from their professional interactions with K.L. (*See* Tr. 452–538.) They are written in narrative form.

Significantly, Ms. Massey does not identify any opinions from these sources assessing a functional limitation more limited than the RFC. *See Audino v. Comm'r of Soc. Sec.*, No. 4:17CV1594, 2018 WL 3520836, at *8 (N.D. Ohio July 5, 2018), *report and recommendation adopted sub nom. Audino v. Berryhill*, 2018 WL 3496084 (N.D. Ohio July 20, 2018) (rejecting claimant's argument that the ALJ should have obtained medical expert testimony, in part, because the claimant "d[id] not cite to any pertinent limitations opined by any medical source and not addressed by the ALJ").

Moreover, the ALJ amply and carefully discussed all the records related to K.L.'s conditions throughout the relevant period, including these records that post-dated the consultants' reports. (*See generally* Tr. 15–19.) The ALJ discussed test results, psychologists' and therapists' notes, opinion evidence, educational records and testing, and Ms. Massey's function report, among other records. The ALJ was entitled to and did consider the scores contained in the IEP, and the information contained in the counseling records, in the context of the other medical and non-medical sources in the record. *See Williams v. Callahan*, Case No. 97-301, 1998 WL 344073, at *4 n.3 (6th Cir. 1998) (noting that, because the record contained the claimant's extensive medical history, the ALJ did not err in not seeking expert medical testimony); *see also Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439, 441 (6th Cir. 2013) (because the record contained test results, physicians' notes, and opinion evidence from multiple physicians, and lacked any

25

significant inconsistencies in the evidence, the ALJ was not obligated to order a consultative examination with a cardiologist or obtain additional medical records).

Taken together, the records that post-dated agency review are readily understood without the need for an additional medical expert review. In other words, this is not a situation where the record "contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion)." *Compare Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008); *see also Seabolt v. Colvin*, No. 5:13-CV-02516, 2014 WL 4093073, at *11 (N.D. Ohio July 17, 2014), *report and recommendation adopted as modified sub nom. Seabolt v. Comm'r of Soc. Sec.*, 2014 WL 4093026 (N.D. Ohio Aug. 19, 2014) ("[T]his case is not so complex that there were questions of medical fact or situations which required the input of a medical expert.").

Here, the ALJ had before him a full and complete medical record, which contained sufficient evidence for the ALJ to decide K.L.'s disability claim absent medical expert testimony. *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *11 (N.D. Ohio Nov. 26, 2014) (When "the record contains sufficient evidence for the ALJ to decide a disability claim absent expert medical testimony, failure to call a medical expert will not support remand."); *Nussbaum v. Comm'r of Soc. Sec.*, No. 5:22-CV-01763-SL, 2023 WL 5353142, at *11 (N.D. Ohio Aug. 1, 2023), *report and recommendation adopted*, 2023 WL 5352398 (N.D. Ohio Aug. 21, 2023) (rejecting claimant's argument that the "esoteric nature" of his condition merited expert testimony because the claimant failed to establish how the existing medical sources did not contain sufficient evidence for the ALJ to make a determination).

Moreover, the Court is not persuaded that the ALJ should have obtained an expert because he found the consultative examiner's opinion and state agency consultants' opinions unpersuasive

in part. (*See* Tr. 18–19.) Notably, the ALJ found them unpersuasive in that they *understated* K.L.'s limitations; in other words, the ALJ credited K.L. with greater limitations than the consultants stated based on the other evidence in the record. But more importantly, the ALJ extensively discussed how he considered the supportability and consistency of those opinions, a task well within his expertise. *See Fergus*, 2022 WL 743487, at *9 (holding that "an ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ'") (*quoting Mokbel-Aljahmi*, 732 F. App'x at 401); *see also Borawski*, 2021 WL 811717, at *18 ("The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence.")

Ms. Massey points to no opinion in the records that post-dated agency review that is inconsistent with the limitations in the RFC. To the contrary, she admits that "what a medical expert would actually say" after reviewing those records "is speculative." (Pl.'s Merit Br. at 6, ECF No. 9, PageID# 677.) Ms. Massey has not convinced the Court that the ALJ abused his discretion under these circumstances.

Finally, Ms. Massey argues that the ALJ's failure to explain his decision not to obtain a medical expert was an abuse of discretion because it prevents the Court from meaningfully reviewing that decision. The Court disagrees.

Ms. Massey cites to no authority holding that an ALJ must explain a decision not to obtain additional medical review of a claimant's file. More importantly, the ALJ *did* explain his decision here. The ALJ heard argument at the hearing about why K.L.'s counsel thought a medical expert was necessary. The ALJ then explained, on the record, that he disagreed because the additional information counsel cited—including new reading-comprehension and mathematics scores—were

readily understood without the need for a medical expert. The ALJ did not err in failing to further explain that decision, especially where—as discussed above—none of the three specific scenarios requiring an expert opinion under HALLEX were present. *See Cline v. Comm'r of Soc. Sec.*, Case No. 1:23-cv-01087, 2024 WL 860627, *3 (N.D. Ohio Feb. 29, 2024) ("The ALJ did not err in failing to explain that discretionary decision.").

In conclusion, the ALJ did not exceed his expertise and "play doctor" here.  Rather, he considered all the relevant evidence, both medical and non-medical records (including those records that entered the record after the consultant report), and he considered any relevant changes since the consultative examination and state-agency review in coming to his conclusions. *See Reinartz v. Comm'r of Soc. Sec.*, 795 F. App'x 448, 449 (6th Cir. 2020). The Court finds no error justifying a remand.

Accordingly, Ms. Massey's assignments of error are overruled.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision denying K.L.'s application for benefits.

**IT IS SO ORDERED.**


Dated:  June 30, 2025                                    */s Jennifer Dowdell Armstrong*
                                                        JENNIFER DOWDELL ARMSTRONG
                                                        UNITED STATES MAGISTRATE JUDGE